## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| GABE HARRIS-CARR,<br>1 Oakdale Road #9<br>Stamford, Fairfield County,<br>Connecticut 06906<br>Individually and On Behalf of All Others<br>Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>INDIA GLOBALIZATION CAPITAL,<br>INC.,<br>4336 Montgomery Avenue<br>Bethesda, Montgomery County,<br>Maryland 20814,<br><br>RAM MUKUNDA,<br>4336 Montgomery Avenue<br>Bethesda, Montgomery County,<br>Maryland 20814,<br><br>and<br><br>CLAUDIA GRIMALDI,<br>4336 Montgomery Avenue<br>Bethesda, Montgomery County,<br>Maryland 20814,<br><br>Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Gabe Harris-Carr ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by

Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding India Globalization Capital, Inc. ("India Globalization" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired India Globalization securities between June 21, 2018 and October 29, 2018, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. India Globalization purports to be focused on the development and commercialization of cannabinoid-based alternative therapies for indications such as Alzheimer's disease, Parkinson's disease, and pain. Its lead product is Hyalolex, an alternative oral therapy for the treatment of symptoms associated with Alzheimer's disease. The Company has filed several patents for its pipeline of products including ones for the treatment of Parkinson's Central Nervous System related disorders, eating disorders, and seizures in cats and dogs. Since its inception, the Company operates a legacy business that involves trading commodities and heavy equipment rental.

3. India Globalization was incorporated in Maryland in 2005, and its common stock trades on the NYSE American exchange ("NYSE American") under the symbol "IGC."

2

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) India Globalization substantially discontinued the business that it conducted at the time it began trading on the NYSE American; (ii) the Company had become engaged in ventures or promotions which have not developed to a commercial stage; (iii) consequently, the Company is not an operating company for the purposes of continued trading and listing on the NYSE American; and (iv) as a result, India Globalization's public statements were materially false and misleading at all relevant times.

5.      On Sunday, October 28, 2018, an article was published on the financial news website *Marketwatch*, entitled, "All the potential red flags for investors in IGC, the pot stock that jumped 1,000% in three months." The article discussed the "alarming number of red flags" it uncovered which "undermine" claims made by the Company. Then, on October 29, 2018, the NYSE American announced "that the staff of NYSE Regulation has determined to commence proceedings to delist the common stock of India Globalization Capital, Inc. (NYSE: IGC) — ticker symbol IGC — from the Exchange. Trading in the Company's common stock on the NYSE American will be suspended immediately." The NYSE American also said that the "Company or its management have engaged in operations which, in the opinion of the Exchange, are contrary to the public interest."

6.      Following this news, the Company's common stock ceased trading on the NYSE American, resulting in significant damages to the Company's stockholders and the Class.

3

7.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

10.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as India Globalization's principal executive offices are located within this Judicial District.

11.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

## PARTIES

12.     Plaintiff, as set forth in the attached Certification, acquired India Globalization securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

13.     Defendant India Globalization is incorporated in Maryland, with principal executive offices located at 4336 Montgomery Avenue, Bethesda, Maryland.

14.     Defendant Ram Mukunda has served at all relevant times as the Company's President and CEO.

15.     Defendant Claudia Grimaldi has served at all relevant times as the Company's Principal Financial Officer.

16.     The Defendants referenced above in ¶¶ 14-15 are sometimes referred to herein collectively as the "Individual Defendants."

17.     The Individual Defendants possessed the power and authority to control the contents of India Globalization SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

18.     India Globalization purports to be focused on the development and commercialization of cannabinoid-based alternative therapies for indications such as Alzheimer's disease, Parkinson's disease, and pain.  Its lead product is Hyalolex, an alternative oral therapy for the treatment of symptoms associated with Alzheimer's disease. The Company has filed several patents for its pipeline of products, including ones for the treatment of

5

Parkinson's Central Nervous System related disorders, eating disorders, and seizures in cats and dogs. Since its inception, the Company operates a legacy business that involves trading commodities and heavy equipment rental.

## Materially False and Misleading Statements Issued During the Class Period

19.     The Class Period begins on June 21, 2018, when the Company filed its annual report on Form 10-K for the fiscal year ended March 31, 2018 (the "2018 10-K") with the SEC, which contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by the Individual Defendants, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

20.     In the 2018 10-K, the Company describes its business in two segments:

***Segment 1: Legacy Infrastructure***
Since our inception, we have participated in various aspects of the infrastructure industry. During the fiscal year 2018, we streamlined our legacy infrastructure business to infrastructure commodity trading, and heavy equipment rental. We trade infrastructure commodities like steel and iron ore, among others, and we rent heavy equipment. Our subsidiary, Techni Bharathi Private Ltd ("TBL") in India is responsible for heavy equipment rental, and its subsidiary IGC Enterprises Ltd. in Hong Kong is responsible for infrastructure trading.

For the rental business, we supply equipment and operators to construction companies. This business is very small and limited to the city of Kochi in Kerala, India. In fiscal year 2018 we have three customers all of which are construction companies. For the trading business we have four customers and no principal supplier. We are opportunistic and will buy from any of the South Asian countries. In fiscal 2018 our suppliers are companies based in India and Hong Kong. For the level of business and the value of each trade, the number of customers we have is adequate and does not constitute inordinate customer risk. Revenue from our legacy infrastructure business including heavy equipment rental and commodity trading is less than 1% based on revenue of both the rental and trading markets. This business is highly competitive, and our differentiation is based primarily on price and industry knowledge of commodity requirements for infrastructure projects. Our strategy in fiscal 2019 for the legacy business is to maintain annual revenue of $3-$5 million and focus on

growing margin by reducing the cost of money and by modest investments in heavy equipment.

The pricing for steel and iron ore are heavily influenced by tariffs and demand for infrastructure development. In fiscal year 2018, steel prices although down from fiscal 2017, fluctuated in a relatively narrow band as did iron ore prices. We do not hedge or take long term positions on commodities. We limit our exposure by contractually ensuring that every purchase has a vetted legitimate buyer and ensuring rapid closing of transactions. On a transaction basis, this business does not require special government approvals. We have the requisite business licenses that allow us to operate in this segment.

In the fiscal years ending March 31, 2018 and 2017, we funded our subsidiary TBL $75,000 and $43,000 for working capital, respectively. For the trading business our sales team is in Hong Kong and the sales cycle lasts between two and three months. For our equipment leasing business our sales team is in Kochi, India, where the sales cycle lasts around two months. In Malaysia, through our subsidiary Cabaran Ultima, we operated a real estate management business. During the fiscal year 2018, we decided to exit this business and as of March 31, 2018, we have accounted for our investment in Cabaran Ultima as "Investment Held for Sale" at a fair value of $147,500. We hope to sell Cabaran Ultima during fiscal year 2019. Please see Note-22, "Investment Held for Sale" for more information.

### Segment 2: Alternative therapies (Complementary and Alternative Medicine, "CAM")

We focus on the development and commercialization of cannabinoid-based combination therapies. Cannabinoids are chemical compounds that exert a range of effects on the body, including impacting the immune response, gastrointestinal maintenance and motility, muscle functioning, and nervous system response and functioning. Phytocannabinoids are cannabinoids that occur naturally in the cannabis plant. Phytocannabinoids are abundant in the viscous resin produced by glandular structures called trichomes. There are over 480 different compounds in the cannabis plant. Many of them have been identified as cannabinoids. Of these, THC (delta-9-tetrahydrocannabinol) is the main psychoactive component in the plant with many therapeutic uses. The other broadly pursued non-psychoactive phytocannabinoid, CBD (Cannabidiol), is pleiotropic influencing many pathways in humans, dogs, and cats, and may be used to provide relief to a variety of symptoms including pain, seizures, and eating disorders. In medical applications, cannabinoids are extracted from the cannabis plant using a variety of well-established technologies, including using $CO_2$, butane, alcohol, among others, as solvents. The refined extracted material is isolated for specific active ingredients like THC and CBD, among others, and used in formulations as the primary or secondary active ingredient.

Our work and strategy are to use cannabinoids synergistically with other active ingredients that in many cases have been established to treat specific conditions. We seek, through the synergies for our combination therapies, to decrease side effects, increase bio-availability, and enhanced efficacy. This strategy in some cases leads to "new and improved" products, and in others it results in totally novel products with surprising results, as in the case of Hyalolex.

We have filed eight provisional patents with the United States Patent and Trademark Office ("USPTO"), in the phytocannabinoid-based combination therapy space, for the indications of pain, medical refractory epilepsy, and cachexia. In addition, in May 2017, we acquired an exclusive license to a patent filed by the University of South Florida Research Foundation entitled "Cannabidiol and Synthetic Dronabinol for treatment of Alzheimer's Disease."

21.    Defendants further stated in the 2018 10-K that the Company has a "competitive advantage":

We believe that there are three factors coalescing to create entrepreneurial opportunities in the cannaceutical industry. The first is deregulation of the industry. This is taking place in the U.S., Canada, Germany, and other parts of the world. We believe that during any major deregulation, it takes several years for market equilibrium to be achieved. Most large companies don't react quickly and that creates entrepreneurial opportunities, including as a first mover. The second factor is that the plant has cannabinoids that work on several pathways, in humans and animals, and that these cannabinoids can potentially be used to treat many diseases and aliments. The third factor is a rising awareness and demand for natural products including natural complementary and alternative medicines.

22.    Further, the 2018 10-K touted the Company's founder as an experienced executive with "in-depth" knowledge of the "medical cannabis industry," "U.S. capital markets, capital structuring, international joint ventures and broad science and engineering . . . .":

**Mr. Ram Mukunda** has served as our CEO and in other capacities since April 29, 2005. Mr. Mukunda is responsible for general management and over the past five years has been largely responsible for the Company's strategy and positioning in the medical cannabis industry. He has been the chief-inventor and architect of all patent filings by the Company including the creation of the Company's lead product Hyalolex. Prior to IGC, from January 1990 to May 2004, Mr. Mukunda served as Founder and CEO of Startec Global Communications, that he took public in 1997 on NASDAQ. Prior to Startec, he served as Strategic Planning Advisor at Intelsat, a communications satellite services provider and prior to that worked in the bond market for a boutique firm

on Wall Street. Mr. Mukunda serves as an Emeritus member on the Board of Visitors at the University of Maryland, School of Engineering. From 2001 to 2003, he was a Council Member at Harvard's Kennedy School of Government, Belfer Center of Science and International Affairs. Mr. Mukunda is the recipient of several awards including, among others, the 2013 University of Maryland's International Alumnus of the year award, the 2001 Distinguished Engineering Alumnus Award, the 1998 Ernst & Young, LLP's Entrepreneur of the Year Award. He holds a B.S. degree in Electrical Engineering, a B.S degree in Mathematics, and a M.S. in Engineering from the University of Maryland. Mr. Mukunda has traveled extensively, and managed companies in Europe and Asia. He has more than 20 years of experience managing public companies and has acquired and integrated more than 20 companies. His in-depth business experience in the medical cannabis industry, his knowledge of U.S. capital markets, capital structuring, international joint ventures and broad science and engineering background make him well qualified to serve as a director of our company.

23.     In the 2018 10-K the Company also purported to maintain "[a] code of business conduct and ethics . . . designed to deter wrongdoing and to promote (a) honest and ethical conduct, (b) full, fair, accurate, timely and understandable disclosure in regulatory filings and public statements, (c) compliance with applicable laws, rules and regulations, (d) the prompt reporting violation of the code and (e) accountability for adherence to the code."

24.     On September 25, 2018, the Company issued a press release entitled, "IGC to Enter the Hemp/CBD-Infused Energy Drink Space," which announced a new product it would sell called "Nitro G," stating in relevant part:

India Globalization Capital, Inc. (NYSE AMERICAN: IGC) announces today that it has executed a distribution and partnership agreement for several products including a sugar free, energy drink called 'Nitro G'.

IGC will pay 797,000 shares of restricted, unregistered, common stock, for a 10-year agreement, with an option for multiple 5-year extensions, for the rights to market the products in the U.S., Canada, Mexico and South America and exclusive global rights to all developed CBD-infused products.

IGC plans to create a branded, hemp/CBD-infused version of the formulation that addresses market demand for energy drinks with the inclusion of healthy properties derived from hemp including CBD.

"According to a Grand View Research forecast, the global energy drinks market is projected to be almost $85 billion by the year 2025, with non-alcoholic beverage sales expected to account for a significant portion of the market. This represents a unique opportunity for the development and commercialization of a CBD-infused, sugar free energy beverage," stated Ram Mukunda, CEO of IGC.

***"By combining the experience of IGC with Hyalolex with the manufacturer in Malaysia, we potentially bring together unique expertise in microencapsulation, solubility, infusion, controlled dose delivery, and sugar free processes, among others.*** This will help introduce an exciting CBD-infused energy drink to the market and the acquired knowledge base can be further leveraged to diversify the delivery method for IGC branded products including Hyalolex, our flagship product for patients suffering from Alzheimer's," continued Mukunda.

***This transaction is particularly timely given the language of the 2018 Farm Bill that currently addresses potentially legalizing, on a federal level, industrial hemp and products derived from it, including hemp oil that contains CBD.***

25.    On this news, the Company's stock skyrocketed from $2.33 per share on September 25, 2018, to $13.00 on October 2, 2018.

26.    The statements referenced in ¶¶ 19-25 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) India Globalization substantially discontinued the business that it conducted at the time it began trading on the NYSE American; (ii) the Company had become engaged in ventures or promotions which have not developed to a commercial stage; (iii) consequently, the Company is not an operating company for the purposes of continued trading and listing on the NYSE American; and (iv) as a result, India Globalization's public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge

27.     On October 28, 2018, an article was published on the financial news website *Marketwatch*, entitled, "All the potential red flags for investors in IGC, the pot stock that jumped 1,000% in three months." The article discussed the "alarming number of red flags" it uncovered which "undermine" claims made by the Company, and included the following allegations:

(a) In the release announcing the plan for CBD-infused drinks, IGC indicates it will work with a manufacturer in Malaysia, but that country has a mandatory death sentence for cannabis possession and no medical marijuana program;

(b) IGC, which started life in 2005 as a blank-check company, has a history of pivoting to new businesses as they become popular and releasing press releases to highlight those business-plan shifts. . . . In 2013, the company started to look into the cannabis industry, where it now claims to be working on treatments for serious diseases including Alzheimer's and Parkinson's, as well as anxiety and sleep disorders. However, a review of its regulatory filings reveals that it has assigned very little funding to research and development — roughly $150,000 a year — and none to clinical studies or any of the other steps needed to win U.S. Food and Drug Administration approval. . . . A look at press releases from the last year shows a clear pattern of repeatedly entering the latest hot market. In late 2017, that was blockchain, while last month it was cannabis that helped push or support the stock above the $1 threshold;

(c) The company has attracted a lot of correspondence from the SEC. In March 2017, the SEC wrote to ask about a 2009 transaction with Bricoleur Capital Management, an investment adviser. The loan from Bricoleur to IGC has been renegotiated several times. IGC's financial statements filed with the SEC as of June 30, 2017, said the company had issued 90,000 shares valued at $36,600 to Bricoleur Partners L.P. against the outstanding $1.8 million promissory note as repayment of interest. Bricoleur's SEC registration was terminated in December 2012, and its license was revoked by the state of Florida in 2015. IGC has received nine late-fling [*sic*] notices from the New York Stock Exchange in just the past three years, prompting the SEC to ask over and over when it is going to comply with the rules. IGC received another notice of delisting from the NYSE in October 2017 and had to ask the SEC for an extension to file and hold a shareholder meeting. The company had still not held a shareholder meeting by December 2017, and it got another notice from the SEC asking when it would comply with its exchange's rules; and

(d) IGC's business partners have issues. The Dama [*sic*] Pharma company in Puerto Rico appears to have been created just in time for an IGC press release, headlined "Puerto Rican Alzheimer's Patients to Be First in U.S. to Obtain Cannabis-Based Relief" on March 26, 2018. It was incorporated three days

before the press release was sent out. DaMa Pharma's only employee is Stephen Inglis, who is also CEO of a company called InPortal USA. InPortal is a facilitator, providing "Compliant Market Access through an equity capital markets (ECM) and a debt capital markets (DCM) platform with a dedicated public corporate landing site and controlled investor access to a deal data room." IGC shares also trade on the Boerse Frankfurt, Stuttgart, and Berlin Exchanges under the ticker symbol "IGS1" and on the Boerse Frankfurt, Boerse Berlin and Boerse Stuttgart under XETRA2," according to the company's filings. IGC's German distribution partner was said to be ready to "distribute its formulations in Germany in early 2018," according to a press release from October 2017. Medicann is a German "medical marijuana retailer website," and its listed CEO is Carsten Siegemund. Medicann was created with just 25,000 euros in capital on May 31, 2017. A search of the site finds no mention of the IGC product Hyalolex, which it claims can treat symptoms of Alzheimer's disease. The site itself is a work in progress, since the map shows the center of Central Park in New York, and the answers to FAQ questions are "lorum ipsum" — filler text often used in place of the eventual content of new website templates and other yet-to-be-published materials. Cartsten Siegemund helps distribute productsfor [*sic*] other penny-stock companies besides IGC. One press release touts a 3.7 million eurosdistribution [*sic*] agreement, pretty big business for a company started six months earlier with a €25,000 investment.

28.     Additionally, the article noted that the Company's financial reporting and auditing operations have tied to a fraudulent cryptocurrency company called Longfin, which recently had $27 million of its assets frozen by the SEC.  Specifically, the Company uses the same public auditor and its current principal accounting officer previously worked at AJSH prior to joining the Company.

29.     The article also warned investors of another senior executive at the Company with specious credentials.  In 2017, the Company's chief scientific officer, Jagadeesh Rao, was caught falsifying data in scientific papers published in the Journal of Neurochemistry, and the International Journal of Neuropsychopharmacology and Psychopharmacology, according to the website Retraction Watch.

30.   Lastly, the article noted that the Company has a history of relying upon paid stock promoters.

31.   Then, on October 29, 2018, the NYSE American announced "that the staff of NYSE Regulation has determined to commence proceedings to delist the common stock of India Globalization Capital, Inc. (NYSE:  IGC) — ticker symbol IGC — from the Exchange.  Trading in the Company's common stock on the NYSE American will be suspended immediately."  The NYSE American also said that the "Company or its management have engaged in operations which, in the opinion of the Exchange, are contrary to the public interest."  Specifically, the announcement stated in relevant part:

> NEW YORK, October 29, 2018 – NYSE American LLC ("NYSE American" or the "Exchange") announced today that the staff of NYSE Regulation has determined to commence proceedings to delist the common stock of India Globalization Capital, Inc. (the "Company") — ticker symbol IGC —from the Exchange.  Trading in the Company's common stock on the NYSE American will be suspended immediately.
>
> NYSE Regulation commenced delisting proceedings against the Company pursuant to Section 1003(c) (i) of the NYSE American Company Guide (the "Company Guide") which states that where *the issuer has substantially discontinued the business that it conducted at the time it was listed or admitted to trading, and has become engaged in ventures or promotions which have not developed to a commercial stage or the success of which is problematical*, it shall not be considered an operating company for the purposes of continued trading and listing on the Exchange.
>
> NYSE Regulation also considered Section 1003(f) (iii) because the Company or its management have engaged in operations which, in the opinion of the Exchange, are contrary to the public interest. Section 1009(a) (ii) of the Company Guide states that it is necessary and appropriate for the protection of investors to immediately suspend trading in the Company's common stock.

32.   Following this news, the Company's common stock stopped trading on the NYSE American, resulting in significant damages to the Company's stockholders and the Class.

13

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

33.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired India Globalization securities during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein; the officers and directors of the Company, at all relevant times; members of their immediate families; and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

34.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, India Globalization securities were actively traded on the NYSE American. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by India Globalization or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

35.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

36.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

37.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of India Globalization;

- whether the Individual Defendants caused India Globalization to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of India Globalization securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

38.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

39.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- India Globalization securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE American and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold India Globalization securities between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

40.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

41.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

42.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

43.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

44.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions,

practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of India Globalization securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire India Globalization securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

45.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for India Globalization securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about India Globalization finances and business prospects.

46.     By virtue of their positions at India Globalization, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to

ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

47.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of India Globalization, the Individual Defendants had knowledge of the details of India Globalization's internal affairs.

48.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of India Globalization. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to India Globalization businesses, operations, future financial conditions and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of India Globalization securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning India Globalization's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired India Globalization securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

49.     During the Class Period, India Globalization securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of India Globalization securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.   At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of India Globalization securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.   The market price of India Globalization securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

50.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

51.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

52.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

53.     During the Class Period, the Individual Defendants participated in the operation and management of India Globalization, and conducted and participated, directly and indirectly, in the conduct of India Globalization's business affairs.  Because of their senior positions, they knew the adverse non-public information about India Globalization's misstatement of the nature of its business, and its false financial statements.

54.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to India Globalization's financial condition, and to correct promptly any public statements issued by India Globalization which had become materially false or misleading.

55.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which India Globalization disseminated in the marketplace during the Class Period concerning India Globalization's business activities.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause India Globalization to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of India Globalization within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of India Globalization securities.

56.     Each of the Individual Defendants, therefore, acted as a controlling person of India Globalization.  By reason of their senior management positions and/or being directors of India Globalization, each of the Individual Defendants had the power to direct the actions of, and

exercised the same to cause, India Globalization to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of India Globalization and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

57.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by India Globalization.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.      determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the class representative;

B.      requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  November 2, 2018                              Respectfully submitted,

                                                     /s/ Daniel S. Sommers
                                                     Steven J. Toll (Md. Bar No. 15824)
                                                     Daniel S. Sommers (Md. Bar No. 15822)
                                                     S. Douglas Bunch
                                                     **COHEN MILSTEIN SELLERS &**
                                                         **TOLL PLLC**

1100 New York Avenue N.W.
Suite 500, East Tower
Washington, DC 20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699
Email: stoll@cohenmilstein.com
          dsommers@cohenmilstein.com
          dbunch@cohenmilstein.com

***Liaison Counsel for Plaintiff***

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
Jonathan Lindenfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
          ahood@pomlaw.com
          jlindenfeld@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ**
**& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Email: peretz@bgandg.com

***Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

I, Daniel S. Sommers, hereby certify that on November 2, 2018, the foregoing was filed with the Court via ECF, which transmitted a copy of the same to all counsel of record.

/s/ Daniel S. Sommers
Daniel S. Sommers

**Submission Date**

2018-10-31 12:15:08

# CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

1.   I make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.  I have reviewed a Complaint against India Globalization Capital Inc. ("India Globalization" or the "Company") or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.  I did not purchase or acquire India Globalization securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.   I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired India Globalization securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  To the best of my current knowledge, the attached sheet lists all of my transactions in India Globalization securities during the Class Period as specified in the Complaint.

6.  During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.  I declare under penalty of perjury that the foregoing is true and correct.

## Name

**Print Name**

Gabe Carr-Harris

## Acquisitions

**Configurable list (if none enter none)**

(see attached)

## Sales

**Configurable list (if none enter none)**

(see attached)

## Documents & Message

(redacted)

**Signature**



**Full Name**

Gabe Carr-Harris

(redacted)

**India Globalization Capital, Inc. (IGC)**                                    **Harris-Carr, Gabe**

### List of Purchases and Sales

| Date | Purchase or Sale | Number of Shares/Unit | Price Per Share/Unit |
|------|------------------|-----------------------|----------------------|
| 10/2/2018 | Purchase | 85 | $11.0000 |